UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 14-CV-6298

BROADCAST MUSIC, INC., ET AL.

Plaintiffs,

VERSUS

THE LIVING ROOM STEAK HOUSE, INC., ET AL.

Defendants.

**REPORT & RECOMMENDATION**

February 26, 2016

**to the Honorable Frederic Block, United States Senior District Judge**

**RAMON E. REYES, JR., U.S.M.J.:**

Plaintiffs Broadcast Music Inc. ("BMI"), Moebetoblame Music, Rondor Music International, Inc. d/b/a Irving Music, EMI Blackwood Music, Inc., Song A Tron Music, Luar Collective Publishing, and Tangerine Music Corp. (collectively, "Plaintiffs"), commenced this action against Defendants The Living Room Steak House, Inc. and Anna Reckovic (collectively "Defendants"), on October 27, 2014, alleging violations of the Copyright Act, 17 U.S.C. §§ 101 *et seq*. Neither defendant filed an appearance in this action. [1]

On April 13, 2015, the Clerk of the Court noted Defendants' default pursuant to FRCP 55(a). (ECF No. 11). On April 27, 2015, Plaintiffs filed a motion for default judgment on their claims. In addition to a request for injunctive relief to prevent Defendants' continued infringement, Plaintiffs seek statutory damages, and attorneys' fees and costs pursuant to 17 U.S.C. §§ 504(c) and 505, respectively. Plaintiffs' motion was referred to me for a report and recommendation. (ECF No. 12; Order dated 4/28/2015.)

For the reasons stated below, I respectfully recommend that Plaintiffs' motion for default judgment be granted. I also recommend that Plaintiffs' motion for a permanent injunction be granted and that Plaintiffs be awarded $16,000 in statutory

---

[1] Defendant Rudi Pejcinovic was voluntarily dismissed from this action on Apr. 9, 2015. (ECF No. 9).

damages and $8,046.90 in attorney's fees and costs.

## BACKGROUND

Plaintiff BMI is a not-for-profit "performing rights society" that licenses the right to publicly perform a catalog of 8.5 million copyrighted musical works on behalf of the owners of the respective copyrights. (Decl. of Hope M. Lloyd ("Lloyd Decl.") ¶¶ 3, 5, ECF No. 12–4.). BMI obtains these public performance rights through agreements with copyright owners and subsequently grants music users, such as restaurant owners, the right to publicly perform works in the catalog by means of "blanket license agreements." (Lloyd Decl. ¶ 2). The other plaintiffs in this action, from whom BMI has acquired public performance rights, are copyright owners of individual musical compositions that are the subject of this lawsuit. (ECF No. 12 (Plaintiffs' Memorandum of Law in Support of Motion for Default Judgment ("Pl. Br.") at 7 [2], ECF No. 12–3; Complaint ("Compl.") ¶¶ 3-10, ECF No. 1). BMI then distributes the revenue it collects in licensing fees as royalties to its affiliated publishers and composers, after deducting operating costs and reasonable reserves. (Lloyd Decl. ¶ 3).

Defendant The Living Room Steak House Inc. is a New York corporation that operates and maintains the establishment known as Living Room Steak House ("LRSH"), located at 2402 86th Street, Brooklyn, New York. (Compl. ¶ 11). During the relevant time period, Plaintiffs allege that defendant Anna Reckovic ("Reckovic") has served as an officer of defendant The Living Room Steak House Inc. with the "primary responsibility for the operation and management of that corporation and [LRSH]." (Compl. ¶ 16). Plaintiffs further allege that Reckovic "has the right and ability to supervise the activities of Defendant The Living Room Steak House Inc. and a direct financial interest in that corporation and [LRSH]." (Compl. ¶ 17).

At some time prior to January 2011, BMI became aware that LRSH was publically playing musical performances without obtaining a license from BMI or the permission of the copyright owners. (Decl. of Brian Mullaney ("Mullaney Decl.") ¶ 3, 12–5). BMI made numerous attempts to contact LRSH regarding the infringement. Between January 2011 and September 2014, BMI's licensing personnel contacted LRSH by phone 46 times and sent 46 letters. (Pl. Br. at 2; Mullaney Decl. ¶ 11; Exhibit C to Mullaney Decl. ("Ex. C"), ECF No. 12–8). BMI's records confirm that some of the letters were delivered and received, and some of the calls were answered by LRSH staff. (Ex. C, ECF No. 12–8). This correspondence noted that LRSH needed to obtain licensing for the publicly played musical performances and urged LRSH to cease and desist from further infringement. (Mullaney Decl. ¶¶ 3, 5–9, 11, 15–18, 22, 24, 26; Ex. C, ECF No. 12–8). BMI also sent letters that LRSH needed to obtain permission to publicly perform copyrighted music in BMI's catalog. (Mullaney Decl. ¶¶ 3, 5–9, 11, 15–18, 22–24, 26; Ex. C, ECF No. 12–8).

BMI took additional measures and sent Timothy Braunscheidel, to LRSH on two occasions – May 17, 2014, and August 8, 2014.[3] (Mullaney Decl. ¶¶ 13, 19; Exhibit

---

[2] Reference is made to page numbers as assigned by the ECF docketing system.

[3] Braunscheidel's Certified Infringement Reports noted that he did not have to pay an entry fee to access LRSH. (Ex. B, ECF No. 12–7).

A to Mullaney Decl. ("Ex. A"), ECF No. 12–6; Exhibit B to Mullaney Decl. ("Ex. B"), ECF No. 12–7). Braunscheidel made audio recordings of the music being publicly performed at LRSH and compiled written reports (Certified Infringement Report). Of the recordings made at LRSH, Braunscheidel's reports yielded that a total of five compositions were infringed by the Defendants: two compositions ("Californication" and "Show Me Love") on May 17, 2014 and three compositions on August 8, 2014 ("Respect," "Dale Don Dale," and "Hit The Road Jack"). (Mullaney Decl. ¶¶ 13,19; Ex. A, ECF No. 12–6). The audio recordings made by Braunscheidel were submitted to BMI Performance Identification employees for analysis and identification of the performed musical works. (Mullaney Decl. ¶¶ 14, 21). The review of Braunscheidel's audio recordings from May 17, 2014, confirmed the performance of one composition – "Show Me Love." (Mullaney Decl. ¶ 14; Ex. A, ECF No. 12–6). A review of the recording from August 8, 2014, confirmed the performance of all three compositions cited in Braunscheidel's report. (Mullaney Decl. ¶¶ 20-21; Ex. A, ECF No. 12–6; Ex. B, ECF No. 12–7).

On May 20, 2014, and August 11, 2014, BMI sent letters by FedEx and First-Class Mail to the defendants advising them of the investigations. (Mullaney Decl. ¶¶ 15, 22, 25). Through the same forms of delivery, cease and desist letters were sent by BMI on May 23, June 23, and August 21, 2014. (Mullaney Decl. ¶¶ 16, 18, 23). On May 23, 2014, via FedEx and First-Class Mail, an additional letter was sent to Reckovic, notifying the Defendants' of their legal obligations. (Mullaney Decl. ¶ 17). On September 15, 2014, BMI notified Defendants by letters sent via First-Class Mail, that the matter had been referred to BMI's attorneys. (Mullaney Decl. ¶ 24). To date, LRSH continues to permit the public performance of licensed music and has not obtained a license for such performance from either BMI or any of the other Plaintiffs. (Mullaney Decl. ¶¶ 4, 27).

## DISCUSSION

### Copyright Infringement Liability

Once a default is entered against a party, all allegations in the complaint except for those relating to liability are assumed as true. *Greyhound Exhibitgroup Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158–59 (2d Cir. 1992). However, a court must still consider whether the alleged facts establish the defaulting party's liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (citation omitted). Here, Plaintiffs seek a default judgment as to their claims of copyright infringement.

To establish a prima facie claim for copyright infringement based on the public performance of a piece of music, the plaintiff must show: "(1) originality and authorship of the copyrighted work; (2) compliance with the formalities of the Copyright Act; (3) ownership of the copyrights involved; (4) the defendant's public performance of the composition for profit; and (5) lack of authorization for the public performance." *Broad. Music, Inc. v. JJ Squared Corp.*, No. 11–CV–5140, 2013 WL 6837186, at *4 (E.D.N.Y. Dec. 26, 2013) (citations omitted*); Shapiro, Bernstein & Co., Inc. v. Club Lorelei, Inc.*, No. 93–CV–0439, 1995 WL 129011, at *2 (W.D.N.Y. Mar. 14, 1995) (citations omitted).

3

### A. Plaintiffs Satisfy the First Three Elements of Copyright Infringement

These first three elements are clearly met here. Specifically, BMI represents the other properly joined Plaintiffs who collectively own the rights to all musical compositions at issue and they further assert that they have valid copyright registrations for each of the infringed works pursuant to the Copyright Act. (*See* Compl. ¶¶ 3–10). The names and copyright registration numbers of the copyrighted songs are included in the "Schedule" attached to the Complaint. (Compl. ¶¶ 7–8).

### B. Defendants' Public Performance of the Composition was for Profit

As to the fourth element, requiring that the Defendants' public performance of the composition be for profit, Plaintiffs did not indicate particular facts to support this element. The totality of the facts as presented, however, allows the Court to draw inferences sufficient to establish LRSH's financial gain from the infringement. As illustrated by the floor plan of the establishment submitted by Plaintiffs, LRSH functioned as a restaurant and a dance club. (Ex. B, ECF No. 12–7). It has a dance floor, a bar, and a DJ booth in which, a DJ performed the five copyrighted songs that were infringed. (Ex. B, ECF No. 12–7). Further, as of the date of this decision, LRSH continues to market itself on its website as an establishment with "Live DJ's Entertainment & Dance Floor." *Living Room Steak House Home Page*, http://livingroomsteakhouse.com/home.html (last visited Feb. 22, 2016). The website provides that from Thursday to Sunday, DJs are scheduled to perform from 11:00 p.m. to 4:00 a.m. *Id*. Indeed, Braunscheidel, BMI's representative, who visited LRSH, noted that the infringed songs were played at the venue using the DJ and ceiling-mounted speakers. (Ex. B, ECF No. 12–7).

As owners and operators of the establishment, Defendants were complicit in the infringement by furnishing the equipment by which the songs at issue were performed. Defendants have a direct financial interest in the business and it is reasonable to infer that they have financially benefited from engaging in and facilitating the infringing conduct. (Compl. ¶ 12, ECF No. 1). Certainly some financial gain has been made from supplying live music in the venue for the presumably paying customers pictured eating and dancing on the website. *Living Room Steak House Home Page*, http://livingroomsteakhouse.com/home.html (last visited Feb. 22, 2016). Indeed, the music is not just a mere enhancement of the customer experience; it is integral to the establishment's key function as a dance club. Without music, the dance floor, DJ, and speaker equipment would have been useless. Therefore, Plaintiffs have established that Defendants' public performance of the composition was for profit.

### C. Defendants Lacked Authorization for the Public Performance

As to the final element requiring a showing that Defendants lacked authorization for the public performance, Plaintiffs have demonstrated, through their own investigation, that the musical works at issue were performed at LRSH on several occasions, without license and thus without plaintiffs' permission. (Mullaney Decl. ¶¶ 4, 13–19, ECF No. 12–5). Further, Defendants, specifically Reckovic, was made aware of the infringement and the need for LRSH to

obtain a licensing agreement in order to lawfully perform the copyrighted music within the establishment. (Ex. C, ECF No. 12–8).[4] As such, Plaintiffs have established that Defendants lacked the authorization for these public performances of the copyrighted music.

Based on the documentary evidence, the Court finds that Defendants are liable for the infringement of four compositions. While Plaintiffs' complaint and the Mullaney declaration allege the infringement of five compositions, only four compositions were ultimately confirmed after review by BMI Performance Identification employees. (Mullaney Decl. ¶¶ 14, 20-21). A review of the August 8, 2014 report confirmed the performance of all three compositions alleged to have been played in LRSH. The May 17, 2014 report, however, only yielded confirmation of one of the two compositions alleged in Braunscheidel's report. (Ex. A, ECF No. 12–6).[5]

---

[4] The correspondence cited in Mullaney's declaration notes that the initial notices were addressed to an individual called "Inne Reckovic." It was not until May 17, 2013, that the notices were addressed to Anna Reckovic. (Ex. C, ECF No.12–8). The Court was able to find ample evidence suggesting that Inne Reckovic is connected with both Anna Reckovic and The Living Room Steak House. Indeed, based on a review of the Affidavit of Service of the Summons in this action, Inne Reckovic is listed as the co-worker upon whom, on behalf of Anna Reckovic and The Living Room Steak House, the Plaintiffs' Summons and Complaint was personally served at the LRSH address in Brooklyn, New York on October 30, 2014. (See ECF Nos. 7 and 8). As such, there is a basis for finding that Anna Reckovic was on notice as to BMI's repeated efforts to have the defendants obtain a license for the musical works being performed.

[5] As noted in Mullaney's declaration, the BMI Performance Identification employees are charged with "…review[ing] the recording to identify and/or verify the performed musical works." (Mullaney Decl. ¶ 14). In accordance with this verification process, Braunscheidel's recordings and reports were reviewed by BMI Performance Identification employees. On May 20, 2014, John Davis, a BMI employee, submitted a declaration stating that he conducted the analysis of the May 17, 2014 recordings and Timothy Braunscheidel's Certified Infringement Report. (Ex. A, ECF No. 12–6). Davis's review yielded the verification of one composition, "Show Me Love." Missing from the schedule of "Identified Songs" was "Californication," which was cited in Braunscheidel's report. Plaintiffs do not appear to dispute this finding. Indeed, Mullaney's declaration recites that all five works are the subject of Plaintiffs' allegations, but ultimately notes the verification of four works; noting that "Mr. Davis's review of the audio recording confirmed the performance of one of the compositions ('Show Me Love') which is alleged in Plaintiffs' Complaint to have been performed". (Mullaney Decl. ¶¶ 13-14, 19-21). As such, while Plaintiffs' allegations are accepted as true, as to liability, however, the review of Plaintiffs' filings indicates that Defendants are liable for the infringement of four copyrighted works.

## D. The Individual Defendants are Jointly and Severally Liable

It is well settled that "[a]ll persons and corporations who participate in, exercise control over, or benefit from…infringement are jointly and severally liable as copyright infringers." *Sygma Photo News, Inc. v. High Soc'y. Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985) (citation omitted). A defendant may be held jointly and severally liable for vicarious infringement, "if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162– (2d Cir. 1971) (citing *Shapiro, Bernstein & Co.*, 316 F.2d at 307). Indeed, courts have found that that "dance hall proprietor[s'can be held] liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Forties B LLC v. Am. W. Satellite, Inc.*, 725 F. Supp. 2d 428,

437 (S.D.N.Y. 2010) (citing *Shapiro, Bernstein & Co.*, 316 F.2d at 307). Further, proprietors may be held liable even if they direct the DJ "…not to play protected works, or [are] unaware that the songs performed were copyrighted." *BMI v. 44th St. Rest. Corp.*, 1995 WL 408399, at *4 (collecting cases) (internal quotation marks and citations omitted). Here, given the Defendants' right and ability to supervise the infringing conduct, and the nexus between the infringement and the financial benefit undoubtedly received, Defendants can be held vicariously liable. For the aforementioned reasons, the Court finds that Plaintiffs' uncontroverted evidence substantiates the claim of copyright infringement and clearly satisfies the required elements.

## RELIEF REQUESTED

### A. Damages

Although a party's default "is deemed to constitute a concession of all well pleaded allegations of liability," such a concession does not extend to the damages inquiry. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F2d 155, 158 (2d Cir.1992). In awarding damages, a court must ensure that there is sufficient basis for the damages specified in the default judgment, and can make such a determination based on a review of the evidence, such as detailed affidavits or documents, without need for an evidentiary hearing. *Fustok v. Conti Commodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). In terms of damages, Plaintiffs request: injunctive relief to prevent the Defendants from continuing their infringement; statutory damages in the amount of $25,000.00, or $5,000.00 for each of the five claims of copyright infringement, pursuant to 17 U.S.C. § 504(c); and the reimbursement by the Defendants of the Plaintiffs' cost, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505. (Pl. Br. at 1).

### 1. Statutory Damages

In lieu of actual damages under the Copyright Act, a plaintiff may receive an award of statutory damages "in a sum of not less than $750 or more than $30,000" per infringement. 17 U.S.C. § 504(c)(1). Furthermore, where a plaintiff demonstrates that the infringement was committed willfully, "the court in its discretion may increase the award of statutory damages to not more than $150,000" per work. 17 U.S.C. § 504(c)(2). An infringement can be considered willful if "the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded that possibility." *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 97 (2d Cir. 1999) (citing *Fitzgerald Publ'g. Co. v. Baylor Pub'g. Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986)).

Courts have also "frequently infer[ed] willfulness where a defendant defaults." *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 631 (S.D.N.Y. 2011); *Nature's Enters., Inc. v. Pearson*, No. 08–Civ–8549, 2010 WL 447377, at *7 (S.D.N.Y. Feb. 9, 2010). This inference is based on the assumption that "an innocent party would presumably have made an effort to defend itself." *Chloe v. Zarafshan*, No. 06–Civ–3140, 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009).

#### a. Calculating Damages and the Willfulness Enhancement

District courts "enjoy wide discretion…in setting the amount of

statutory damages." *Bryant v. Media Right Prod. Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (citations and quotation marks omitted). In exercising this discretion in the context of awarding statutory damages for the infringing conduct, a court may consider:

> (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties.

*Id*. at 144.

The Plaintiffs are entitled to statutory damages for the infringement of the five musical works at issue. Plaintiffs' evidence substantiates Defendants' willful misconduct and thus particular emphasis is placed on "the conduct and attitude of the parties" in the subsequent analysis. *Bryant*, 603 F.3d at 144. BMI has shown that it was in constant and one-sided communication with the Defendants from January 2011 through September 2014. (*See* Mullaney Decl ¶¶ 3, 5–9; Ex. C, ECF No. 12–8). BMI made numerous telephone calls, sent various letters and furnished proof that the letters were delivered and the phone calls were received. (Ex. A, ECF No. 12–6; Ex. B, ECF No. 12–7; Ex. C, ECF No. 12–8). The Defendants, as proprietors of the establishment, did not respond to any of BMI's correspondence during the three years and, although BMI delineated the procedure to acquire a license, apparently made no efforts to obtain one. (*See* Mullaney Decl. ¶ 12, ECF No. 12–5).

The evidence of Defendants' conduct over the three years shows a conscious and blatant disregard for the copyrights at issue: The refusal to obtain a license, despite constant solicitations and warnings that failure to execute a licensing agreement would result in liability under the Copyright Act, coupled with BMI's investigative efforts, established that music from the BMI catalog was being performed within LRSH long after initial contact was made with the Defendants. (Mullaney Decl. ¶¶ 13,19). Defendants' disregard demonstrates an attitude of blatant indifference and the Court finds these acts to be willful. Thus, statutory damages greater than the minimum are warranted.

### b. Damages Calculation

When a defendant has acted willfully, "a statutory award should incorporate not only a compensatory, but also a punitive component to discourage further wrongdoing by the defendants and others." *Hounddog Prods.*, 826 F. Supp. 2d at 631. In the context of infringement of musical works, the damages total purposefully exceeds the amount of unpaid license fees. Courts have continually held that this marked increase serves to put infringers "on notice that it costs less to obey the copyright laws than to violate them." *Broadcast Music, Inc. v. Pamdh Enters., Inc.*, No. 13–CV–2255, 2014 WL 2781846, at *3 (S.D.N.Y. June 19, 2014) (citing *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F. Supp. 656, 660 (S.D.N.Y. 1996) (internal quotation and citation omitted).

Courts have awarded statutory damages that at least double the unpaid licensing fees. *See Pamdh Enters., Inc.*, No. 13–CV–2255, 2014 WL 2781846, at *8 (S.D.N.Y. June 19, 2014). *See also Realsongs, Universal Music Corp. v. 3A N. Park Ave. Rest Corp.*, 749 F. Supp. 2d 81,

87 (E.D.N.Y.2010) (awarding $3,000 for each of the five claims of infringement, reflecting approximately three times the amount of unpaid license fees); *Broadcast Music, Inc. v. 120 Bay St. Corp.*, 09–CV–5056, 2010 WL 1329078, at *2–3 (E.D.N.Y. 2010) (awarding $4,207.50 for each of seven claims of infringement, reflecting "approximately three times the amount plaintiffs would have received in licensing fees if defendants had been properly licensed"); *Broadcast Music, Inc. v. N. Lights, Inc.*, 555 F. Supp. 2d 328, 333 (N.D.N.Y. 2008) (awarding $4,000 for each of ten claims of infringement, reflecting approximately two times the unpaid licensing fees for the relevant time period).

Defendants' estimated unpaid license fees from February 2011, when Plaintiffs first contacted them, until October 2014, when the complaint was entered, totals $5,000. (Mullaney Decl. ¶ 27) (noting that the fees were $1,087.50 for February 2011 to January 2012; $1,100 from February 2012 to January 2013; $1,137.50 for February 2013 to January 2014; $1,162.50 for February 2014 to January 2015). The plaintiffs request statutory damages in the amount of $25,000, which represents an award of $5,000 for each of the five claims of copyright infringement, pursuant to 17 U.S.C. §502. (Pl. Br. at 1).

In cases of willful infringement, courts in this Circuit typically award statutory damages between three and five times the cost of the licensing fees the defendant would have paid. *Broadcast Music, Inc. v. Prana Hospitality, Inc.*, No. 15– Civ–1987, 2016 WL 280317 (S.D.N.Y. Jan. 21, 2016) (citing five Second Circuit cases that have awarded statutory damages in copyright infringement cases of three to five times the amount the defendants would have paid in licensing fees). Here, given the Court's finding of willfulness, coupled with well settled case law on the punitive quality of damages exceeding the unpaid licensing fees, the Court finds that an award of $16,000 or $4,000 per infringement is appropriate. This amount, which is approximately four times the amount Defendants would have paid in licensing fees, serves to compensate all affected copyright holders. Further, it protects the rights of the publishers and composers affiliated with BMI by punishing the unlawfulness and discouraging future infringement.

### B. <u>Injunctive Relief</u>

Plaintiffs seek an order permanently enjoining Defendants from further infringement of Plaintiffs' copyrighted works. (Compl. ¶ 5). The Copyright Act gives courts the discretion to grant temporary or final injunctions "…on such terms as it may deem reasonable and necessary to prevent or restrain infringement of a copyright." 17 U.S.C § 502(a). However, the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), noted that this discretion should be exercised in a manner that comports with "…traditional principles of equity." *eBay Inc.*, 547 U.S. at 394. The Court in *eBay* then established that, before a court can grant a permanent injunction, the moving party must satisfy elements of a four-factor test by showing:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance

of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id*. at 391.

The four-factor test is a notable departure from the previous standard that allowed courts to presume irreparable harm once copyright infringement had been established, placing instead, a burden on the moving party to present facts substantiating the requested relief. *Pamdh Enterprises, Inc.*, 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014) (quoting *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) ("A court must not presume irreparable harm; rather, 'plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm.'")).

Applying these factors, in the context of infringement of a musical work, "[m]onetary damages awarded after the fact do not provide an adequate remedy in a case such as this where the actual loss caused by the infringement cannot be measured precisely." *Broad. Music, Inc. v. Bayside Boys, Inc.*, No. 12–CV–03717, 2013 WL 5352599, at *7 (E.D.N.Y. Sept. 23, 2013). Also, "the failure to issue a final injunction" would "be tantamount to the creation of a compulsory license" with "future damages then becoming a sort of royalty…" as opposed to compensation for the harm. *Nat'l Football League v. Primetime 24 Joint Venture*, No. 98 CIV. 3778, 1999 WL 760130, at *4 (S.D.N.Y. Sept. 27, 1999) (citations omitted). *See also Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004).

The same principle applies here because any payment of past license fees would be equivalent to a payment of a royalty, instead of compensation for losses suffered from infringement in the first place. Further, in considering the balance of hardships, it is evident that Plaintiffs' burden of time and cost of litigating every future violation outweighs the burdens on the Defendants to obtain a license or to not infringe altogether. As noted by the Second Circuit, "[i]n the copyright realm…an injunction should be granted if the denial would amount to a forced license to use the creative work of another." *Silverstein*, 368 F.3d at 84 (citing *Nat'l Football League,* 1999 WL 760130 at *4).

It is clear from Defendants failure to respond to BMI's communications over three years, their failure to obtain a license agreement to during his period, and the fact that the establishment is still marketed as a dance club, that Defendants have no intention of following the law and will likely continue to violate Plaintiffs' copyrights without an injunction. Defendants' actions have caused, and will continue to cause, damage that cannot be adequately compensated solely by a monetary award. Here, an injunction would enjoin Defendants from continually infringing rather than to impose the hardship of "[r]equiring Plaintiffs to commence litigation for each future violation". *Buttnugget Publ'g v. Radio Lake Placid, Inc.*, 807 F. Supp. 2d 100, 109 (N.D.N.Y. 2011). Lastly, the permanent injunction would serve the public interest by prohibiting the infringing conduct in furtherance of copyright law. Accordingly, the Court respectfully recommends that Plaintiffs' request for an injunction be granted, thereby preventing Defendants from performing the songs in the BMI catalog without a license pursuant to 17 U.S.C. § 502.

### C. Attorney's Fees

Plaintiffs seek attorneys' fees under Section 505 of the Copyright Act, which permits a court to mandate "the recovery of full costs by or against any party" and "…also award a reasonable attorney's fee to the prevailing party as a part of the costs." 17 U.S.C. §505. Although costs and attorneys' fees are regularly awarded in copyright infringement cases, a finding of infringement no longer guarantees prevailing party's attorney's fees. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 518, 520 (1994). Instead, in assessing the suitability of attorneys' fees, courts are urged to evaluate factors such as, "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Blanch v. Koons*, 485 F. Supp. 2d 516, 517 (citing *Fogerty*, 510 U.S. at 534 n.19) (citation omitted). Here, the deterrence factor is most significant because the infringement continued years after BMI's initial contact. Thus, Defendants evidently need to be deterred from future infringement and an award of attorneys' fees is connected with that goal.

#### 1. Calculation of the Attorney's Fees and Costs

Plaintiffs' attorney seeks $7,500 in attorney's fees, pursuant to a flat-rate agreement between Gibbons P.C. and the Plaintiffs, which provides for payment of fixed fees during different phases of the litigation. (*See* Declaration of J. Brugh Lower ("Lower Decl.") ¶ 2, ECF No. 12–9; Exhibit 1 to Lower Declaration ("Ex. 1"), ECF No. 12–10; Exhibit 2 to Lower Declaration ("Ex. 2"), ECF No. 12–11). Within this Circuit, flat-rate attorney's fees are often not awarded unless backed by detailed supporting documents of contemporaneous time records specifying: work done, relevant dates and time expended for each individual working on the litigation. *Mack Fin. Servs. v. Poczatek*, No. 10–CV–3799, 2011 WL 4628695, at *10 (E.D.N.Y. Aug. 30, 2011) (citation omitted).

Even if the Second Circuit standard requiring documentation is satisfied, flat-rate attorney's fees are still subject to the "considerable discretion" of district courts to determine their reasonability. *Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008). This determination is reached by applying the "presumptively reasonable fee" standard, a derivative of the historical lodestar method, and comparing it to the flat-fee amount. *Pamdh Enters., Inc.*, 2014 WL 2781846, at *6. *See also City of Burlington v. Dague*, 505 U.S. 557, 562 (1992); *Arbor Hill Concerned Citizens Neighborhood Ass'n.*, 522 F.3d at 183, 189. The presumptively reasonable fee is a "…product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro–North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).

#### 2. Presumptively Reasonable Fee: Reasonable Rate and Hours Expended

The mere presence of an agreement between private parties to pay a flat-fee is a "strong indication of what said parties believe is the 'reasonable' fee to be awarded." *Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001). Reasonability of hourly rates are guided by the prevailing market rate "in the community for similar services by lawyers

of reasonably comparable skill, experience and reputation," *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). The relevant community generally encompasses the "district in which the court sits." *Polk v. New York State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir.1983). "Although attorney rates are generally evaluated in comparison to those charged in the district in which the court sits, courts in the Eastern District of New York often use rates for New York City attorneys awarded in the Southern District of New York as a basis for comparison". *Entral Grp. Int'l v. Sun Sports Bar Inc.*, No. 05–CV–4836, 2007 WL 2891419, at *10 (E.D.N.Y. Sept. 28, 2007) (citations omitted).

Gibbons P.C. utilized the expertise of both attorneys and paraprofessionals during all phases of this litigation. (Lower Decl. ¶ 6). Plaintiffs' counsel, J. Brugh Lower, included a detailed account of their professional backgrounds, normal hourly rates, and the individual time spent litigating this case. (*See* Lower Decl. 2–4). Owen McKeon is an attorney staffing this case. (*See* Lower Decl. 2, 3). Mr. McKeon is experienced in the field of copyright law and formerly served as a Director in the Intellectual Property Department at Gibbons P.C. (*See* Lower Decl. ¶ 6(a)). His rate was $600 per hour. (Lower Decl. ¶ 6(a)). J. Brugh Lower, who bills at an hourly rate of $385, is admitted to practice in two states and a number of Federal courts. (*See* Lower Decl. ¶ 6(b)). Martin Brech is a Managing Clerk at Gibbons P.C. and has served in that capacity for fifteen years. Mr. Brech's rate is $205 per hour. (Lower Decl. ¶ 6(c)). Fritz Sammy is a Case Manager at Gibbons P.C. and his rate is $200 per hour. (Lower Decl. ¶ 6(d)). Ariel M. Franklin Raggugi is a Knowledge Management Research Analyst at Gibbons P.C. and hourly rate is $155 per hour. (Lower Decl. ¶ 6(e), ECF No. 12–9).

These hourly rates fall well within the range of what courts in this District have considered reasonable for similarly experienced attorneys and paralegals. *See, e.g., Union of Orthodox Jewish Congregations of Am. v. Royal Food Distributors Liab. Co.*, 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009) (finding partner and associate rates of $735 and $445, respectively, reasonable); *GAKM Res. LLC v. Jaylyn Sales Inc.*, No. 08–Civ–6030, 2009 WL 2150891, at *8 (S.D.N.Y. July 20, 2009) (approving $650 and $600 hourly rates for partners specializing in intellectual property litigation and $195 hourly rate for a paralegal); *Pyatt v. Raymond*, No. 10–CIV–8764, 2012 WL 1668248, at *6 (S.D.N.Y. May 10, 2012) (discussing cases that approved rates ranging from $400 to $650 for partners in copyright and trademark cases); *Diplomatic Man, Inc. v. Nike, Inc.*, No. 08 CIV. 139, 2009 WL 935674, at *5–6 (S.D.N.Y. Apr. 7, 2009) (finding that New York firm partners rates of $650 per hour for and paralegal rates of $200 per hour were reasonable); *Lucky Brand Dungarees, Inc. v. Ally Apparel Res.*, LLC, No. 05 CIV. 6757, 2009 WL 466136, at *6 (S.D.N.Y. Feb. 25, 2009) (finding rates of $235.00 per hour, $220.00 per hour, and $205.00 per hour for paralegal work reasonable); *Entral Grp. Int'l. LLC v. Sun Sports Bar Inc.*, No. 05–CV–4836, 2007 WL 2891419, at *10 (E.D.N.Y. 2007) (finding hourly rates of $560.00 for a partner in a copyright infringement action reasonable). Accordingly, the Court finds these hourly rates reasonable.

### 3. Hours Expended by Plaintiffs' Counsel

The "hours expended" portion of the presumptively reasonable fee analysis requires courts to view "particular hours

expended by counsel with a view to the value of the work product of the specific expenditure to the client's case." *Entral Grp. Int'l. LLC v. Sun Sports Bar Inc.*, No. 05–CV–4836 (CBA), 2007 WL 2891419, at *9 (E.D.N.Y. 2007) (citations omitted). Further, District courts are urged to "exclude excessive, redundant or otherwise unnecessary hours..." when evaluating submitted time records. *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999) (citations omitted). This further ensures that the ultimate amount is in fact reasonable. *Id.* at 425. "[A]ny attorney...who applies for court-ordered compensation in this Circuit…must document the application with contemporaneous time records…specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

Plaintiffs' attachment to the Lower Declaration provides records stating the date, description of services rendered, and time spent. (Ex. 1, ECF No. 12–10). These records indicate that: Mr. McKeon spent 1.5 hours on this matter; Mr. Lower spent 31.3 hours; Mr. Brech spent 0.5 hours; Mr. Sammy spent 0.5 hours; and Ms. Ragucci spent 0.2 hours, for a total of 34 hours expended on the litigation of this case. (Lower Decl. ¶ 4; Ex. 1, ECF No. 12–10). Based on a thorough review of Plaintiffs counsel's submitted documents, which details the breakdown of time expended by each attorney and paralegal that worked on the case, the Court finds no redundancy in the time expended and consequently finds these hours reasonable. (*See* Ex. 1, ECF No. 12–10).

### 4. Plaintiffs' Counsel is Entitled to Attorney's Fees

Based on the preceding analysis, I recommend that the Plaintiffs should be awarded the flat-fee of $7,500. Had Plaintiffs been billed, based on a collective calculation of hourly rates, the amount would have totaled $13,183.50. Applying the presumptively reasonable fee standard and comparing both costs, it is evident that the hourly fee would have far exceeded the flat-fee rate of $7,500. Therefore, the Court finds these fees reasonable and the award of attorney's fees should be granted.

### D. Costs

Plaintiffs' attorney seeks $546.90 in costs related to filing and service of the Complaint. (Lower Decl. ¶¶ 3–8; Ex. 1, ECF 12–10; Ex. 2, ECF 12–11). Plaintiffs' attorney has submitted a substantial and detailed accounting of costs associated with this litigation. Such costs are routinely accrued during the course of litigation and are typically awarded by courts. *Pamdh Enters., Inc.*, 2014 WL 2781846, at *5–8; *GAKM Res. LLC v. Jaylyn Sales Inc.*, No. 08–Civ–6030, 2009 WL 2150891, at *10 (S.D.N.Y. July 20, 2009) (noting that filing fees, service fees, and transportation expenses are "the types of routine costs awarded to prevailing parties in trademark and copyright infringement actions"). *See also LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998) (quoting *United States Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989)) (stating that attorney's fees awards include reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to clients). Accordingly, I recommend that Plaintiffs' request for costs in the amount of $546.90 be granted.

## CONCLUSION

Based on the foregoing, I respectfully recommend that the Court grant Plaintiffs' motion for a default judgment, award Plaintiffs statutory damages in the amount of $16,000, plus costs and attorney's fees totaling $8,046.90, and issue a permanent injunction prohibiting Defendants from further infringing the Plaintiffs' copyrights.

Plaintiffs are hereby directed to serve copies of this Report and Recommendation upon Defendants by next-day mail by February 29, 2016, at each of their last known addresses, and to promptly file proof of service with the Clerk of the Court. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Frederic Block within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).
SO ORDERED.

*Ramon E. Reyes, Jr.*
RAMON E. REYES, JR.
United States Magistrate Judge

Dated: February 26, 2016
Brooklyn, NY